# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| TWIN RIVER WORLDWIDE HOLDINGS, INC., | ) ) ) ) ) |
| Plaintiff, | ) ) |
| | ) **Civil Action No. _____** |
| vs. | ) ) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., | ) ) ) **DEMAND FOR JURY TRIAL** |
| Defendant. | ) ) ) ) ) |

## PLAINTIFF'S ORIGINAL COMPLAINT

1. Plaintiff, Twin River Worldwide Holdings, Inc. ("Twin River" or the "Company"), for its Complaint against Defendant, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), states as follows:

## NATURE OF THE ACTION

2. In this action, Twin River seeks compensatory damages for National Union's breach of an insurance contract and bad faith claims handling. Specifically, Twin River seeks compensatory damages for National Union's wrongful and bad faith refusal to indemnify Twin River for defense costs and settlement payments incurred in connection with claims asserted by stockholders alleging that Twin River and certain of its directors and officers breached their fiduciary duties.

NAI-1502368164v1

## THE PARTIES

3. Twin River is a corporation organized and existing under the laws of Delaware with its principal place of business in Lincoln, Rhode Island.

4. National Union is a corporation organized and existing under the laws of Pennsylvania with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted in this Complaint pursuant to 28 U.S.C. § 1332 because Twin River is not a citizen of the same states as National Union, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

6. Venue is proper in the District of Rhode Island because a substantial part of the events and transactions giving rise to the controversy occurred in Rhode Island, as required by 28 U.S.C. § 1391.  Among other things, National Union delivered the insurance policy at issue to Twin River's offices in Lincoln, Rhode Island; Twin River approved and initiated payment of premiums for the policy from Lincoln, Rhode Island; and the financial harm to Twin River as a result of National Union's wrongful conduct occurred in Rhode Island.  Further, one of the underlying **Claims** (as that term is defined in the Policy) was litigated in the District of Rhode Island.  In addition, the insurance policy at issue is subject to Rhode Island law in various respects as it is endorsed with a "Rhode Island Amendatory Endorsement," Endorsement 1, which conforms the insurance policy's terms to comply with various provisions of Rhode Island law regarding cancellation and renewal of policies.

7. Personal jurisdiction in Rhode Island is proper because, at all relevant times, National Union has been licensed or authorized to sell insurance in and has transacted business in Rhode Island, including with Twin River, by performing a series of acts within Rhode Island

for the purpose of realizing pecuniary benefit, including contracting to insure persons, property, or risks located in Rhode Island.

## THE NATIONAL UNION POLICY

8. National Union provided Directors, Officers, and Private Company Liability Insurance to Twin River for the period November 5, 2013 to November 5, 2014 (the "Policy," Exhibit A). The applicable insuring agreements provide in relevant part:

### COVERAGE B: PRIVATE COMPANY INSURANCE

(i) **Company** *Liability*: This policy shall pay the **Loss** of any **Company** arising from a **Claim** made against such **Company** for any **Wrongful Act** of such **Company**.

(ii) *Indemnification of an* **Individual Insured**: This policy shall pay the **Loss** of a **Company** arising from a:

(a) **Claim** made against an **Insured Individual** for any **Wrongful Act** of such **Individual Insured**; * * * but only to the extent that such **Company** has indemnified such **Individual Insured**.

(Policy, Endorsement 21 at p. 1.)

9. The term "**Claim**" is defined to include both "a written demand for monetary or non-monetary relief" and "a civil . . . proceeding for monetary or non-monetary relief which is commenced by: (1) service of a complaint or similar pleading."

10. The term "**Wrongful Act**" is defined, in relevant part, as:

(i) with respect to any **Executive** . . . any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Executive** . . . in their respective capacities as such . . . ;

(ii) with respect to a **Company**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by a **Company**;

11. The term "'**Related Wrongful Act(s)**' means **Wrongful Act(s)** which are the same, related or continuous, or **Wrongful Act(s)** which arise from a common nucleus of facts.

**Claims** can allege **Related Wrongful Act(s)** regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action."

12. The term "**Loss**" means "damages, judgments, settlements . . . and **Defense Costs**." The term "**Defense Costs**" means:

> reasonable and necessary fees, costs and expenses consented to by the **Insurer** . . . resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against an **Insured** . . . **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

13. **General Condition 6, NOTICE/CLAIM REPORTING PROVISIONS**, provides in relevant part:

> (a) The **Insureds** shall, as a condition precedent to the obligations of the **Insurer** under this policy, give written notice to the **Insurer** of any **Claim** made against an **Insured** . . . as soon as practicable after: (i) the **Company's** Risk Manager or General Counsel . . . becomes aware of the **Claim** . . . , but in all events a **Claim** must be reported no later than []:
>
>> (i) anytime during the **Policy Period** * * *
>
> (b) If written notice of a **Claim** has been given to the **Insurer** pursuant to Clause 6(a) above, then any **Claim** which is subsequently made against the **Insureds** and reported to the **Insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same or is a **Related Wrongful Act** to the alleged in the **Claim** of which such notice has been given, shall be considered made at the time such notice was given.

14. Exclusion (t)(iv) provides in relevant part:

**4. EXCLUSIONS**

> The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**: * * *
>
> (t) with respect to Coverage B(i) only: * * *

(iv) seeking fines or penalties or non-monetary relief against the **Company**; provided, however, that this exclusion shall not apply to any **Securities Claim**.

15. Securities Claim is defined in relevant part as follows:

a **Claim** made against any **Insured:**

(i) alleging a violation of any federal . . . regulation, rule or statute regulating securities, including, but not limited to, the purchase or sale, . . . which is: * * *

(2) brought by a security holder of a **Company** with respect to such security holder's interest in securities of such **Company**; or

(ii) brought derivatively on behalf of a **Company** by a security holder of such **Company**.

## THE UNDERLYING CLAIM

16. On June 23, 2009, Twin River's predecessor company filed for bankruptcy protection in the Bankruptcy Court for the District of Rhode Island. Twin River successfully reorganized and emerged from bankruptcy protection on November 5, 2010.

17. In its Bankruptcy Court-approved Plan of Reorganization (the "Plan"), Twin River's prepetition first lien lenders received 100% of Twin River's common stock and $300 million in new first lien debt, and the prepetition second lien lenders received contingent value rights ("CVRs"). The CVRs constituted the right to receive a portion of the consideration that would otherwise have been payable to the stockholders if a "CVR Payment Event" (such as a merger involving a sale of control of Twin River) occurred prior to November 5, 2017, the seven-year anniversary of the Company's emergence from bankruptcy.

18. As contemplated by the Order confirming the Plan (the "Confirmation Order"), the stockholders and holders of CVRs (the "CVR Holders") entered into a further document governing the CVRs (the "CVR Agreement"), which document was valid, binding and

enforceable without further action from the Bankruptcy Court. Among other things, the CVR Agreement, which was heavily negotiated by representatives of the stockholders and CVR Holders, provides that the CVR Holders would begin to share in the recovery upon the occurrence of a CVR Payment Event that, when combined with any earlier payments or distributions to the stockholders from the operations of the Company, resulted in the stockholders recovering in excess of the payment thresholds.

19. Twin River has performed remarkably well since it emerged from bankruptcy. To illustrate: in 2011, Twin River's common stock traded on the over-the-counter market at about $10 per share; by 2015, its common stock was trading as high as $50 per share.

20. Twin River's exceptional performance contributed to disputes between some of its stockholders and CVR Holders. These tensions came to the surface in 2014, when the Company reported an increased valuation for the CVRs as a result of distributions of profits made to stockholders and a debt refinancing. Under the terms of the CVR Agreement, these two events lowered the payment threshold for any CVR Payment Event.

21. The disputes and inherent tension between the stockholders and CVR Holders hamstrung the Company in its ability to pursue strategic alternatives such as acquisitions, capital formation and other transactions.

22. In a letter dated June 27, 2014 (the "First Stockholder Demand"), two stockholders alleged that Twin River's directors and officers had breached their fiduciary duties to the stockholders and that the directors and officers were acting as if they owed fiduciary duties to the CVR Holders (to whom the directors and officers owed no fiduciary duties). The two stockholders further alleged that the CVR Agreement violated the Confirmation Order and was contrary to the stockholders' interests. These stockholders also contended that CVR trades were

being executed at inflated prices because of misinformation regarding the CVR Agreement that the Company had failed to correct, and that the Company was overvaluing the CVRs in the Company's audited financial statements.

23.     The First Stockholder Demand included a records request pursuant to the terms of the Company's Shareholder Agreement and pursuant to a stockholder's statutory right of inspection under Section 220 of the Delaware General Corporation Law.  This records request was not an end in itself, but was discovery in support of these stockholders' breach of the fiduciary duty claims against Twin River's directors and officers.

24.     Twin River attempted to resolve the claims asserted in the First Stockholder Demand.  However, these negotiations revealed only that the dispute could not be resolved amicably, but only through litigation.  Indeed, it was apparent that if Twin River did not obtain clarification of its obligations under the Confirmation Order and the CVR Agreement, derivative litigation was imminent against its directors and officers.

25.     On October 22, 2014 Twin River gave National Union written notice of the First Stockholder Demand.

26.     On October 27, 2014, National Union responded to that notice: "As this matter does not involve a claim as defined by the Policy and no claim has been made against an insured, the reporting of this potential claim or notice of circumstances is acknowledged under a mutual reservation of rights."

27.     Both Twin River and the stockholders who filed the First Stockholder Demand recognized that their dispute required resolution by the Bankruptcy Court.  On November 17, 2014, Twin River filed first, moving to reopen the bankruptcy proceeding to seek clarification of the Confirmation Order on an expedited basis.  Specifically, Twin River sought an order

clarifying that the CVR Agreement permissibly provides additional detail to the Plan's general framework for the valuation of the CVRs and therefore properly governs the calculation of the CVR threshold amounts (the "Motion for Clarification").

28. The stockholders behind the First Stockholder Demand and a third stockholder responded to the Motion for Clarification (collectively, the "Complaining Stockholders"). The Complaining Stockholders agreed that the bankruptcy case should be reopened. However, the Complaining Stockholders disagreed that the issues raised by the Motion for Clarification should be decided on an expedited basis or on motion. They requested that "an appropriate process and schedule should be put in place to litigate the issues in such motion." Specifically, they requested a hearing "upon a full factual record consistent with the due process required for contested matters under the Federal Rules of Bankruptcy Procedure."

29. On January 9, 2015, the Bankruptcy Court reopened the bankruptcy cases for the limited purpose of "resolving the controversy" that was the subject of Twin River's Motion for Clarification. The Bankruptcy Court, however, rejected Twin River's attempt to resolve that controversy through a Motion for Clarification, and ordered that the controversy be resolved through an adversary proceeding under the rules of Part VII of the Federal Rules of Bankruptcy Procedure.

30. As required by the Bankruptcy Court's January 9, 2015 order, on January 21, 2015, Twin River filed an "Adversary Proceeding Complaint" seeking an order clarifying the Confirmation Order and the validity of the CVR Agreement. Certain of the CVR Holders joined the adversary proceeding as plaintiffs. The parties took discovery over the next several months and they filed cross-motions for summary judgment in July 2015.

31. On November 3, 2015, the Bankruptcy Court granted summary judgment to Twin River and the CVR Holders, ruling that the CVR Agreement did not violate the Confirmation Order or the Plan. In the Adversary Proceeding, Twin River incurred over $2 million defending the actions that the Company and its officers and directors took pursuant to the CVR Agreement.

32. On November 13, 2015, the Complaining Stockholders filed a notice of appeal with this Court. That appeal was assigned to Chief Judge William E. Smith.

33. Also on November 13, 2015, the Complaining Stockholders reasserted their demands in writing and further asserted that they would seek to recover the legal fees that they had incurred in connection with the Adversary Proceeding.

34. While the bankruptcy court's judgment was on appeal, Twin River proposed to make a tender offer to purchase the CVRs for $400 each. The Complaining Stockholders thereafter complained that the proposed tender offer price was too high, while the CVR Holders complained that the proposed price was too low.

35. The Company announced the proposed tender offer for the CVRs of $400 each on December 22, 2015, which expired at midnight on January 22, 2016.

36. On December 30, 2015, one of the Complaining Stockholders filed a derivative action in the Delaware Court of Chancery (the "Derivative Suit") against the Company, its Board of Directors and its CFO. The Derivative Suit sought an injunction or, in the alternative, an award of rescissionary damages.

37. The Derivative Suit, like the First Stockholder Demand, asserted that the Company's directors and officers owed fiduciary duties exclusively to the stockholders. The crux of the Derivative Suit was that the "[t]he Board's decision to launch the Tender Offer . . . grossly violate[d] its fiduciary duties to the Company's shareholders." The stockholder also

contended that a "Board Observer" for the CVR Holders impermissibly participated in the Board's deliberations or decision-making with respect to the Tender Offer. It further alleged, consistent with the allegations in the First Stockholder Demand, that, in assessing and authorizing the Tender Offer, the Board was under a mistaken belief that it owed fiduciary duties to CVR Holders.

38. On January 5, 2016, Twin River gave National Union written notice of the Derivative Suit.

39. Also on January 5, 2016, National Union issued a second letter regarding coverage for the First Stockholder Demand. Recognizing for the first time that the First Stockholder Demand was indeed a **Claim** as that term was defined in the Policy, National Union asserted that it sought *only* "non-monetary relief" and took the position that the **Claim** did not qualify as a **Securities Claim**. Accordingly, National Union declined coverage for the First Stockholder Demand under Exclusion (t)(iv) of the Policy, which precludes coverage for any **Claim** "seeking . . . non-monetary relief against the **Company**" unless that **Claim** is a **Securities Claim**.

40. As a result of the filing of the Derivative Suit, Twin River postponed the Tender Offer.

41. In a letter dated January 21, 2016, the Complaining Stockholders offered to settle all disputes, including the Derivative Suit, for, among other things, $5.6 million (which represented an estimate of the attorneys fees and expenses expended by the Complaining Stockholders in the Rhode Island adversary action) and a cap on the consideration being offered to the CVR Holders under the Tender Offer. This demand for $5.6 million and a cap on the

consideration to be paid to the CVR Holders reinforced the point, clear from the outset, that the Complaining Stockholders had not been seeking only non-monetary relief.

42. On or about January 28, 2016, having received National Union's denial of coverage for the First Stockholder Demand and not having heard from National Union regarding coverage for the Derivative Suit, Twin River requested and received National Union's consent to settle all matters related to the First Stockholder Demand, including the Derivative Suit, for $5.6 million of cash consideration. National Union expressly agreed not to raise lack of consent as a defense, subject to an otherwise complete reservation of rights, including the right to dispute the reasonableness of the settlement.

43. In February 2016, Twin River reached agreements with the stockholders and CVR Holders settling various claims relating to these disagreements. The settlement resolved, among other things, all of the claims of the Complaining Stockholders against Twin River and its directors and officers.

44. Under the Settlement Agreement, Twin River agreed to pay $5.6 million to the Complaining Stockholders. It also agreed to modify the terms of the Tender Offer and implement certain specified corporate governance changes.

45. The Delaware Chancery Court had a hearing on the settlement. It found the settlement reasonable and approved it on May 3, 2016. The Complaining Stockholders thereafter dismissed their appeal of the Bankruptcy Court's order.

46. On May 19, 2016, National Union again denied coverage for the First Stockholder Demand, including the costs of defending, adjusting and settling that claim, on two purported grounds. First, it argued the Stockholder Demand sought only non-monetary relief. Second, it asserted that the claim was not a **Securities Claim** and, consequently, was not excepted from

Exclusion (t)(iv). National Union agreed, however, that there was potential coverage for the costs of defending the Derivative Suit.

47. As required by the Policy, Twin River and National Union mediated their coverage dispute, but no resolution was reached.

48. In all, Twin River expended $2,136,353 defending its and its directors' and officers' actions in the Adversary Proceeding. It paid $5.6 million to settle the Complaining Stockholders' claims first asserted in the First Stockholder Demand, and it paid $320,345 to defend the Derivative Suit.

49. To date, National Union has reimbursed Twin River for none of these claimed expenses, including even the fees incurred in defending the Derivative Suit.

**FIRST CAUSE OF ACTION:
BREACH OF CONTRACT**

50. Twin River repeats and re-alleges the allegations of paragraphs 1 through 49 hereof as if they were fully set forth herein.

51. The First Stockholder Demand and the Derivative Suit constitute separate "**Claims**" that arise out of the same **Wrongful Acts** or **Related Wrongful Act(s)**. To the extent other written demands or filings referenced herein also constitute separate **Claims**, they all arise out of the same **Wrongful Acts** or **Related Wrongful Act(s)**. Accordingly, all of the **Claim(s)** referred to herein are considered made at the time Twin River gave notice of the First Stockholder Demand.

52. Twin River has complied with all applicable conditions of the Policy that National Union did not waive or for which performance has been excused.

53. No exclusion bars coverage for Twin River's loss. In particular, Exclusion (t)(iv) does not bar coverage because, among other things, (1) both the First Stockholder Demand and

the Derivative Suit sought monetary relief, and (2) both the First Stockholder Demand and the Derivative Suit qualified as **Securities Claims** because they were brought derivatively on behalf of the **Company** by a security holder of the **Company**.

54. National Union has refused to pay the amounts owed under the Policy.

55. By reason of the foregoing, National Union has breached its contractual obligations under the Policy, and Twin River has incurred damages as a result of that breach.

## SECOND CAUSE OF ACTION:
## BAD FAITH UNDER RHODE ISLAND GENERAL LAWS § 9-1-33(a)

56. Twin River repeats and re-alleges the allegations of paragraphs 1 through 55 hereof as if they were fully set forth herein.

57. National Union wrongfully and in bad faith refused to pay **Claims** made pursuant to the provisions of the Policy, and otherwise wrongfully and in bad faith refused to timely perform its obligations under the Policy, in violation of Rhode Island General Laws § 9-1-33(a).

58. National Union has violated Rhode Island General Laws § 9-1-33(a) in a number of ways, including, among others:

    a.    by failing and refusing to attempt in good faith to effectuate prompt, fair and equitable settlement of Twin River's claims for which liability had become reasonably clear under the Policy;

    b.    by compelling Twin River to commence and prosecute this action by offering substantially less than the amounts currently due, and which will ultimately be recovered, under the Policy; and

    c.    by refusing to pay Twin River's claims under the Policy without conducting a reasonable investigation.

59.  In particular, under Rhode Island law, an insurer has a responsibility to assemble all facts necessary for a fair and comprehensive investigation before it refuses to pay a claim. National Union failed to conduct a fair and comprehensive investigation of the First Stockholder Demand.  For example, just three business days after receiving Twin River's October 22, 2014 notice of the First Stockholder Demand, on October 27, 2014 National Union summarily concluded that the First Stockholder Demand was not a **Claim**.  On information and belief, National Union knowingly reached and communicated that conclusion to Twin River without having conducted any investigation or evaluation of the underlying facts concerning the First Stockholder Demand.

60.  More than a year after concluding that the First Stockholder Demand was not a **Claim**, with no subsequent investigation or evaluation of the facts or claims, and without explanation, on January 5, 2016 National Union abruptly changed positions and asserted that the First Stockholder Demand was indeed a written demand for non-monetary relief.  In doing so, National Union tacitly conceded that the First Stockholder Demand was, in fact, a **Claim**, contrary to its initial (and uninformed) coverage position.

61.  Rather than acknowledge the availability of coverage, National Union instead unreasonably and in bad faith denied coverage on the ground that the Complaining Stockholders were not seeking "monetary relief" and that the **Claim** did not qualify as a **Securities Claim**, even though, as made plain by the First Stockholder Demand itself, the **Claim** was made by the Complaining Stockholders derivatively on behalf of the Company.

62.  Following its unreasonable denials of coverage in January 2016 and May 2016, and despite having been provided with additional information, including copies of all the relevant pleadings in the Adversary Proceeding and subsequent written demands by the

Complaining Stockholders, National Union has stubbornly refused to retract its wrongful denial of coverage for the First Stockholder Demand, including for Twin River's defense and settlement costs.

63. In addition, National Union also refused promptly to acknowledge coverage for the defense costs that Twin River incurred in the defense of the Derivative Suit, even though National Union knew, at least as early as January 2016, that: (1) the defendants were all **Insureds**; (2) the lawsuit was brought on behalf of securities holders of Twin River; (3) the claimants in the Derivative Suit did not receive any assistance from Twin River or any executive of Twin River; and (4) no Policy exclusion applied.

64. Specifically, despite receiving timely notice of the Derivative Suit in early-January 2016, National Union delayed providing a coverage opinion for five months until late-May 2016. During that five month period, National Union never acknowledged the potential for coverage for the Derivative Suit. Indeed, National Union only acknowledged *potential* coverage for the costs of defending the Derivative Suite and consented to the retention of defense counsel for it on May 19, 2016, *after the Derivative Suit had been settled*. National Union had no defense to paying the cost of defending the Derivative Suit; nevertheless, it reserved its rights to paying those covered defense costs on the ground that the Derivative Suit may have been filed with the aid of one or more of Twin River's officers and directors. National Union still has not paid these defense costs. Accordingly, at a minimum, National Union failed within a reasonable time to affirm or deny coverage for the cost to defend the Derivative Suit, and it failed to effectuate a prompt, fair and reasonable settlement of Twin River's claim for coverage for the cost to defend the Derivative Suit after its liability was reasonably clear.

65. National Union has also improperly refused to pay or indemnify Twin River for the settlement of all of the Complaining Stockholders' **Claims** even though (i) National Union agreed not to raise lack of consent as a coverage defense, and (ii) the Delaware Court of Chancery, the leading venue for stockholders' suits in the country, concluded, after an extensive hearing, that the $5.6 million settlement payment was fair and reasonable.

66. As a result of National Union's deliberate and wrongful conduct, Twin River has suffered compensatory damages beyond the denial of the Policy's proceeds, including the cost of having to commence litigation to recover amounts due under the Policy, which litigation will result in the recovery of substantially more than what National Union has offered to pay under the Policy.

67. The foregoing actions taken by National Union in disregard of Twin River's rights under the Policy are wrongful, intentional, willful, wanton, malicious, oppressive, unscrupulous and offend public policy, any one of which would justify an award of punitive damages sufficient to punish National Union and to deter such conduct in the future.

### THIRD CAUSE OF ACTION:
### COMMON LAW BAD FAITH

68. Twin River repeats and re-alleges the allegations of paragraphs 1 through 67 hereof as if they were fully set forth herein.

69. Under Rhode Island law, an insurer is liable for common law bad faith if it had no reasonable basis for denying policy benefits and if it had knowledge of or recklessly disregarded the lack of a reasonable basis in denying those policy benefits.

70. National Union had no reasonable basis to assert that the First Stockholder Demand was not a **Claim**, as it must now concede. Further, its alternative reasons for denying policy benefits—that the First Stockholder Demand sought only non-monetary relief and was not

a **Securities Claim**—were obviously wrong and lacked any reasonable basis, as Twin River repeatedly explained to National Union, to no avail, well before initiating this proceeding. Notwithstanding all of the contrary information provided to it demonstrating the fundamental unreasonableness of its coverage positions, National Union nevertheless continues to improperly deny and withhold coverage for the cost of defending, settling and adjusting that **Claim**, which includes the cost of litigating the Adversary Proceeding and the Derivative Suit and the settlement payment of $5.6 million.

## JURY TRIAL DEMAND

71. Twin River, pursuant to Rule 38 of the Federal Rules of Civil Procedure, demands trial by jury on all issues triable of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Twin River respectfully prays for the following:

A. Judgment in favor of Twin River and against National Union on this Complaint, in an amount to exceed $75,000; and

B. An Order awarding Twin River such other and further relief as the Court deems just and proper, including, but not limited to, punitive damages, prejudgment interest at 12%, and Twin River's attorney fees, costs and expenses associated with bringing this claim.

Twin River Worldwide Holdings, Inc.
By its Attorney,

/s/W. Mark Russo
W. Mark Russo (#3937)
Caitlin M. Wolstencroft (#9352)
**FERRUCCI RUSSO P.C.**
55 Pine Street, 4th Floor
Providence, RI 02903
Tel.: (401) 455-1000
Fax: (401) 455-7778
E-mail: mrusso@frlawri.com

Dated: January 9, 2017